NO. 24-3163

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

───────────────

TAYLOR CHEAIRS,

*Mr. Cheairs - Appellant,*

v.

CITY OF SEATTLE (and its officers, employees and agents),
SEATTLE POLICE DEPARTMENT (and its officers,
employees and agents), and JOHN DOES 1-10 (unidentified
members of the Seattle Police Department),
*Defendants - Appellees,*

───────────────

On Appeal from the United States District Court
for the Western District of Washington
No.: 2:21-cv-01343-LK
Honorable Lauren King

───────────────

### APPELLEES' ANSWERING BRIEF

───────────────

Thomas P. Miller, WSBA # 34473
Stuart A. Cassel, WSBA # 49808
Keating Bucklin & McCormack, Inc., P.S.
801 Second Avenue, Suite 1210
Seattle, WA 98104
(206) 623-8861 Telephone
tmiller@kbmlawyers.com
scassel@kbmlawyers.com
*Attorneys for Appellees*

# TABLE OF CONTENTS

## Contents

I.   Introduction ........................................................................ 1

II.  Statement of Jurisdiction ................................................... 2

III.   Statement of Issues ....................................................... 3

IV.   Statement of the case .................................................... 4

   A.  Factual Background ...................................................... 4

      1.  Summer 2020 Protests in Seattle ............................... 4

      2.  June 7-8, 2020 Incident ............................................ 5

      3.  The City's Training on Demonstration Management
and Use of Blast Balls ...................................................... 8

      4.  Mr. Cheairs' Involvement in June 7-8, 2020 Incident 11

      5.  Unrelated Black Lives Matter Seattle-King County et.
Al. v. City of Seattle Litigation and Contempt Order .......23

   B.  Procedural Background................................................27

V.   Summary of Argument......................................................32

VI.   Standard of Review.......................................................33

VII.   Argument..................................................................34

A.   Mr. Cheairs' Fourth Amendment Claim Fails Because He was Never Seized because Officer Anderson did not Restrict Mr. Cheairs' Freedom of Movement nor Seek to Restrain him when Deploying the Blast Ball. ...........................................34

1.   Mr. Cheairs was not Seized. .....................................35

2.   The Force Used Was Neither Unreasonable nor Excessive. ........................................................38

B.   Mr. Cheairs' First Amendment Claim was Properly Dismissed because there is No Evidence the Officers acted with Any Retaliatory Animus when Deploying the Blast Ball. 41

1.   Mr. Cheairs Does Not Dispute He Was in Violation of RCW 9A.84.020, which is Not Constitutionally Protected Activity. ...........................................................44

2.  Mr. Cheairs' Actions were Neither a Motivating Nor Substantial Factor in Officer Anderson's Decision to Deploy the Blast Ball. ....................................................45

C.  Mr. Cheairs Cannot Establish *Monell* Liability because there is No Evidence of Any Unconstitutional Policy, Custom, or Practice to Establish Municipal Liability............48

1.  There is No Unconstitutional Custom or Policy that Supports a Monell Claim..................................................50

2.  There was No Deliberate Indifference to a Known Need to Train Given the City's Comprehensive Policies and Training that were Approved by the Monitor and a Federal Court. .................................................................54

3.  The City did not Ratify any Constitutional Violations. 56

VIII.  Conclusion....................................................................58

# TABLE OF AUTHORITIES

## Cases

*Adderley v. Florida,* 385 U.S. 39, 48 (1966) ...........................42

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68, 90 S. Ct. 1598 (1970) ........................................................................50

*Arpin v. Santa Clara Valley Transp. Agency,* 261 F.3d 912, 919 (9th Cir. 2001) ....................................................................33

*Bd. of the Cty Comm'rs*, 520 U.S. at 409 ................................55

*Black Lives Matter Seattle-King Cnty. v. Cty. of Seattle ("BLM II")*, 505 F. Supp.3d 1108 (W.D. Wash. Dec. 7, 2020) .25, 52, 53

*Black Lives Matter Seattle-King County et al. v. City of Seattle, Seattle Police Department ("BLM I")*, 466 F. Supp.3d 1206 (W.D. Wash., June 12, 2020)..................................24, 44, 52

*Blankenhorn v. Cty. of Orange*, 485 F.3d 463, 470 (9th Cir. 2007) .................................................................................33

*Bradshaw v. Zoological Soc. Of San Diego*, 662 F.2d 1301, 1304 (9th Cir. 1981) ........................................................... 3

*Brower v. Cnty. of Inyo*, 489 U.S. 593, 596-97, 109 S. Ct. 1378 (1989)..................................................................................36

*Cantwell v. Connecticut*, 310 U.S. 296, 308, 60 S. Ct. 900 (1940)..................................................................................42

*Case v. Kitsap County Sheriff's Dep't.,* 249 F.3d 921, 929 (9th Cir. 2001) ............................................................................50

*Catlin v. United States*, 324 U.S. 229, 233 (1945)....................3

*Cervantes v. San Diego Police Chief Shelley Zimmerman*, No. 17-CV-01230-BAS-AHG, 2020 WL 5759752, *7 (S.D. Cal. Sept. 28, 2020) ..................................................................45

*Christie v. Iopa*, 176 F.3d 1231, 1238 (9th Cir. 1999).............56

*City of Canton v. Harris*, 489 U.S. 378, 390, 109 S. Ct. 1197 (1989)..................................................................................55

*City of Houston, Tex. v. Hill,* 482 U.S. 451, 461, 107 S. Ct. 2502 (1987) ................................................................41, 42

*Clouthier*, 591 F.3d at 1249 ...................................................50

*Collins v. Jordan*, 110 F.3d 1363 (9th Cir. 1996)...................47

*Colten v. Kentucky,* 407 U.S. 104, 109 (1972) ........................45

*Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011) ..............54

*Cox v. State of La.*, 379 U.S. 536, 554, 85 S. Ct. 453 (1965)...42

*Davis v. City of Ellensburg*, 869 F.2d 1230, 1233-34 (9th Cir. 1989) ....................................................................51

*Dundon v. Kirchmeier*, 577 F. Supp. 3d 1007, 1040-42 (D. N.D. 2021) ................................................................36

*Estate of Osuna v. Cty. of Stanislaus*, 392 F. Supp. 3d 1162, 1174 (E.D. Cal. 2019)..........................................48

*Feiner v. New York*, 340 U.S. 315, 321, 71 S. Ct. 303 (1951) .43

*Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 373 (1981)................................................................. 2

*Fordyce v. Cty. of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995) ...44

*Galen v. County of Los Angeles*, 477 F.3d 652, 667 (9th Cir. 2007) ..................................................................49

*Gillette v. Delmore*, 979 F.2d 1342, 1348 (9th Cir. 1992) .......57

*Graham v. Connor*, 490 U.S. 386, 394 n. 10, 109 S. Ct. 1865 (1989)....................................................35, 38, 39

*Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1096 (9th Cir. 2013) ..................................................................49

*Grayned v. City of Rockford*, 408 U.S. 104, 116, 92 S. Ct. 2294 (1972) ....................................................................42

*Haugen v. Brosseau,* 339 F. 3d 857, 875 (9th Cir. 2003).........57

*Headwaters Forest Defense v. Cnty. of Humboldt*, 276 F.3d 1125 (9th Cir. 2002) ...........................................................40

*Hicks v. City of Portland*, No. CV 04-825-AS, 2006 WL 3311552, *12 (D. Or. Nov. 8, 2006) ...................................45

*Hopper v. City of Pasco*, 241 F.3d 1067, 1083 (9th Cir. 2001)49

*Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817, 827 n. 4 (9th Cir. 2020).......................................44

*Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991) ...........................................................34

*Jurkowski v. City of Seattle*, C15-1155 TSZ, 2017 WL 4472859, at *2 (W.D. Wash. Oct. 5, 2017) .....................9, 36

*Lacey v. Maricopa County*, 693 F.3d 896, 916-17 (9th Cir. 2012) ..................................................................44

*Martinez v. Nygaard*, 831 F.2d 822, 826 (9th Cir. 1987).........34

*Menotti v. City of Seattle*, 409 F.3d 1113, 1131 (9th Cir. 2005) ......................................................................42

*Monell v. Dep't of Soc. Servs. of Cty. of N.Y.*, 436 U.S. 658, 98 S. Ct. 2018 (1978) .......................................................passim

*Nelson v. City of Davis*, 685 F.3d 867 (9th.Cir. 2012). 39, 40, 41

*Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) ..............43, 46

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986) .......56

*Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 770 (9th Cir. 2006) ..................................................................44

*Quintanilla v. City of Downey*, 84 F.3d 353, 355 (9th Cir. 1996) ......................................................................48

*S.R. Nehad v. Browder*, 929 F.3d 1125, 1132 (9th Cir. 2019) .33

*Salvato v. Miley*, 790 F.3d 1286, 1296 (11th Cir. 2015)..........57

*Sanderlin v. City of San Jose*, No. 20-cv-04824-BLF, 2021 WL 2662094 at *3 (N.D. Cal. Jun. 29, 2021)..............................51

*Sanderlin v. Dwyer*, __ F.4th __, 2024 WL 4033065, *4 (9th Cir. 2024) ..........................................................34

*Sandoval v. Cnty. of Sonoma*, 912 F.3d 509, 515 (9th Cir. 2018) ...................................................................................33, 34

*Seidner v. de Vries*, 39 F.4th 591, 596 (9th Cir. 2022) ............34

*Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005)......38

*State v. Dixon*, 78 Wn.2d 796, 808-11, 479 P.2d 931 (Wash. 1971) .................................................................................43

*Szajer v. Cty. of Los Angeles*, 632 F.3d 607, 610 (9th Cir. 2011) ...................................................................................33

*Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S. Ct. 1868 (1968)......35

*Torres v. Madrid*, 592 U.S. 306, 317, 141 S. Ct. 989 (2021)..36, 37

*Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) ...........51, 53

*Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1145 (9th Cir. 2012) .................................................................................55

*United States v. Grace,* 461 U.S. 171, 177–78, (1983) ............42

*Van Ort v. Estate of Stanewick*, 92 F.3d 831, 837 (9th Cir. 1996) .................................................................................49

*Wilson v. Meeks,* 52 F.3d 1547, 1554 (10th Cir. 1995)............50

*Wood v. Moss*, 572 U.S. 744, 756-57 134 S. Ct. 2056, 2066 (2014) ...................................................................41

*Young v. County of Los Angeles*, 655 F.3d 1156 (9th Cir. 2011) ...................................................................39, 40

*Yousefian v. City of Glendale*, 779 F.3d 1010, 1016 (9th Cir. 2015) ...................................................................50

## Statutes

28 U.S.C. § 1291 .................................................................. 2

28 U.S.C. § 1331 .................................................................. 2

42 U.S.C. § 1983 ..........................................................2, 55, 56

42 U.S.C. §1983 ...............................................................29

## Rules

Fed. R. Civ. P. 56(a) ...........................................................33

Fed. R. Civ. P. 56(c) ...........................................................33

RCW 9A.84.020 ...........................................................12, 43

## I.    INTRODUCTION

In the summer of 2020, Seattle faced significant protests in response to the murder of George Floyd in Minneapolis. While these protests were largely non-violent, some protests were punctuated by significant violence, including rocks, bottles, lasers, glass, and other projectiles thrown at law enforcement. This case involves a protest on the night of June 7-8, 2020 that became violent and included repeated assaults on law enforcement officers. After a lawful dispersal order was issued, the officers at the scene used professional crowd management techniques and less lethal munitions, including blast balls, to enforce the order and protect public and officer safety. The officers never targeted any specific protestors.

Appellant Taylor Cheairs was present as a bystander at this protest on the night of June 7-8, 2020. He was standing at the front of the crowd facing a police line filming the events with his phone. After the dispersal order was issued, Mr. Cheairs remained in the area instead of leaving as ordered. One of the blast balls struck Mr. Cheairs, and he alleges this violated this Fourth and First Amendment rights. However, there is no

1

evidence any officer was aware of Mr. Cheairs' presence at the protest, nor his filming. And there is no evidence Mr. Cheairs was the target of the blast ball that struck him, rather he acknowledges he was accidentally hit. There is no constitutional violation when officers facing violent assaults employ judicially vetted crowd management techniques to move the crowd pursuant to a lawful dispersal order and accidentally hit a bystander whom they never sought to restrain or target. The District Court properly dismissed Mr. Cheairs' claims and this Court should affirm.

## II. STATEMENT OF JURISDICTION

The United States District Court for the Western District of Washington had jurisdiction over this matter pursuant to 28 U.S.C. § 1331, because Mr. Cheairs alleged constitutional claims under 42 U.S.C. § 1983. (5-ER-855–56.) This Court has jurisdiction pursuant to 28 U.S.C. § 1291, which provides this Court with jurisdiction over "all final decisions of the District Courts . . . except where a direct review may be had in the Supreme Court." *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 373 (1981). A decision is final if it "ends the litigation

on the merits and leaves nothing for the court to do but execute the judgment." *Bradshaw v. Zoological Soc. Of San Diego*, 662 F.2d 1301, 1304 (9th Cir. 1981) (quoting *Catlin v. United States*, 324 U.S. 229, 233 (1945)). The District Court's April 24, 2024, Order granting appellees City of Seattle's and Seattle Police Department's ("SPD") (collectively "the City") motion for summary judgment was final and the District Court entered a judgment for the City that same day. (1-ER-4–34.) Mr. Cheairs timely appealed on May 16, 2024. (5-ER-889–90.)

## III.   STATEMENT OF ISSUES

1. Whether summary judgment in the City's favor on Mr. Cheairs' Fourth Amendment Claim should be affirmed, because Mr. Cheairs was not seized as there is no evidence Officer Anderson targeted him nor restricted his freedom of movement when deploying the blast ball.

2. Whether the Court should affirm summary judgment in the City's favor on Mr. Cheairs' First Amendment claim when

there is no evidence any officers retaliated against Ms. Cheairs for engaging in First Amendment activity.

3. Whether the Court should affirm summary judgment in the City's favor on Mr. Cheairs' § 1983 municipal claim, because there is no evidence to support any *Monell*[1] theory that an unconstitutional custom or policy was the moving force behind any alleged constitutional violation.

## IV.   STATEMENT OF THE CASE

### A. Factual Background

#### *1.    Summer 2020 Protests in Seattle*

On May 29, 2020, the first major protests following the murder of George Floyd occurred in downtown Seattle, which, while largely non-violent, were also punctuated by significant looting, assaults, and other acts of violence. (4-ER-557–60, 591–92, 779–82; 5-ER-796.) On May 30, the disorder escalated to include an attempted breach of SPD headquarters, mass looting in the Pike, Pine, and Westlake areas of downtown, the burning

---

[1] *Monell v. Dep't of Soc. Servs. of Cty. of N.Y.*, 436 U.S. 658, 98 S. Ct. 2018 (1978).

of two SPD vehicles, and assaults on officers. (4-ER-591–596.) That same day, Seattle Mayor Jenny Durkan issued an emergency declaration prohibiting people from possessing improvised weapons including rocks, bottles, pipes, shields, and similar items within a defined section of the city. (4-ER-591–93, 779–81; 5-ER-804–812.)

### 2. *June 7-8, 2020 Incident*

On June 7, 2020, a large crowd gathered near the intersection of 11th Avenue and Pine Street during the day. (4-ER-717–20, 723–26.) Captain Matthew Allen was designated the Night Shift Operational Commander and Lieutenant John Brooks was Deputy Operational Commander. (5-ER-799.) Prior to taking command, Captain Allen, Lieutenant Brooks, and others formulated a deployment plan intended to de-escalate the situation. (5-ER-786.) Under that plan, SPD made use of fencing stretching from north to south across Pine Street, on the east side of the 11th and Pine intersection. (5-ER-786–87.) SPD personnel would remain out of view, and any arrests would be made by a team stationed inside the East Precinct sally port (garage). (5-ER-786.) In addition, a microphone connected to a large bank of

speakers positioned on the sidewalk facing the crowd allowed the Incident Commander to communicate with the crowd. (5-ER-787.) Captain Allen assumed command of the SPD officers near the East Precinct at approximately 4:12 p.m. (*Id.*) The situation remained calm for several hours. (5-ER-787–88.) Things first started to change at approximately 7:17 p.m., when protesters breached the fence and ignored Captain Allen's warnings over the loudspeaker system to stop. (5-ER-787.) Allen decided to deploy officers in line across Pine Street approximately 30 yards east of the original fence line. (5-ER-788.) About 100 protesters eventually crossed the fence and began "inching" towards the officer line. (*Id.*)

At 8:20 p.m., a vehicle drove into the crowd, and the driver shot a protester who confronted him before surrendering to SPD. (4-ER-633.) Afterward, the situation escalated, with protesters barricading portions of Pine Street and, by about 9:20 p.m., shouts to burn the East Precinct were heard. (5-ER-789.) By 9:37 p.m., the crowd had disassembled the fencing and were advancing on the SPD lines. (*Id.*)

Between approximately 10:00 p.m. and 10:20 p.m.,

protesters were observed handing out walkie-talkies and arming themselves with sections of cut fencing, rocks, and other improvised armaments. (4-ER-633–34; 5-ER-789–90.) SPD received reports that launchers capable of firing projectiles to the police lines were being assembled in Westlake Park. (4-ER-633.) Over the next hour and a half, the crowd advanced on the line of officers, continuing to ignore Captain Allen's directives to move back. (4-ER-633–34; 5-ER-790–91.) By 11:36 p.m., the crowd advanced within five feet of the officers on Pine Street when someone threw a glass bottle, striking a National Guardsman assisting SPD. (5-ER-790.) Captain Allen told the crowd not to throw objects. (*Id.*) At approximately 12:04 a.m. on June 8, individuals in the crowd threw objects at the north end of the officer line, and at least one officer deployed OC[2] spray in response. (4-ER-633–34; 5-ER-791.) Blast balls were deployed moments thereafter. (5-ER-791.) Immediately after seeing the disturbance Captain Allen gave dispersal orders over the loudspeaker. (*Id.*) He began issuing dispersal orders at approximately 12:04 a.m. and continued to do so for several

---

[2] Oleocapsicum resin.

minutes thereafter. (4-ER-563–64, 657; 5-ER-791.)

### 3. The City's Training on Demonstration Management and Use of Blast Balls

On June 7, 2020, as with other demonstrations, some SPD officers were equipped with less-lethal munitions, namely OC spray and blast balls, which are designed to create space and stop assaultive behavior or property destruction. (4-ER-560.) Those tools are intended to counter resistance without relying on greater force options (such as long batons and other impact weapons) that increase the likelihood of injury to the suspect, to the community, or to the involved officers. (*Id*.) A blast ball is a light and sound diversion device that can also help to disrupt ongoing criminal acts by causing a loud noise and flash of light. (*Id*.) SPD only issues inert blast balls (which do not have any payload in them) and OC blast balls (which contain a small amount of OC powder that disperses once the blast ball detonates). (*Id*.) A blast ball consists of a metal fuse that is ignited by pulling out a horizontal pin while depressing the "spoon," or metal lever that runs down the side of the blast ball. (4-ER-560, 641–46.) Once the pin is removed and the spoon is released (once the user throws the blast ball or lets go of it), the fuse lights and the metal

8

fuse section including the spoon separates from the rubber portion of the blast ball at low velocity. (4-ER-560–61, 641.) After the fuse section separates, the rubber portion of the blast ball will later detonate. By operating in this fashion, only the rubber portion of the blast ball detonates. (4-ER-561.)

When the blast ball detonates, the rubber portion separates into two hemispheres and a loud noise and light are emitted. (4-ER-561.) Blast balls are common crowd management tools and are utilized by law enforcement agencies throughout the country. (*Id*.) Officers selected to carry blast balls are specially trained and certified, and recertified annually, through courses that combine practical usage with classroom review of law and policy. (*Id.*; *see also Jurkowski v. City of Seattle*, C15-1155 TSZ, 2017 WL 4472859, at *2 (W.D. Wash. Oct. 5, 2017).) The City's use of force and crowd management policies and training are among the most comprehensive in the nation. (3-ER-476–77, 506–13.)

SPD's policies and training have been heavily vetted and scrutinized. The City has been subject to a federal consent decree since 2012. Under the consent decree, once SPD proposes

changes to its policies, they are sent to the U.S. Department of Justice and the court-appointed monitor for review and approval. (2-ER-36–38, 59–66.) After that review is complete, the draft policies are submitted to the United States District Court for the Western District of Washington for final review and approval. (2-ER-67–87.) In reviewing SPD materials, the Monitor determines whether they are "congruent with Constitutional requirements … embody best practices, and reflect the policies and practices of the finest law enforcement agencies in the country." (*Id*.) The policies that Mr. Cheairs challenges in this lawsuit underwent this rigorous review and approval process. (2-ER-88–97, 128–140.) After DOJ and the Monitor complete their reviews, the proposed revisions are reviewed and approved by the court. (2-ER-98–141.) The Consent Decree also requires SPD to make extensive improvements to its training. DOJ and the Monitor worked closely with SPD over several months to develop SPD's training manual regarding use-of-force principles and use of less lethal devices; this foundational manual for SPD's training instructors was submitted to the court by the Monitor and subsequently approved by court order. (*Id.*)

### 4. Mr. Cheairs' Involvement in June 7-8, 2020 Incident

On the night of June 7, Mr. Cheairs had just returned to Seattle when he decided to go to Capitol Hill from his home in Columbia City to get dinner. (3-ER-431, 439–40.) After dinner, Mr. Cheairs became curious about the protests, parked, and began walking to the area around 11th and Pine where protests were occurring. (3-ER-440.) As he was walking over to the protest area, Mr. Cheairs did not form any intent to engage in protest activity himself and did not feel like sending any message when he arrived; instead, he wanted to observe. (3-ER-441–42.) Mr. Cheairs recalled walking alone and not talking to anybody or directly interacting with anybody else in the crowd. (3-ER-445.) Mr. Cheairs took two cell-phone videos documenting his activity at the event. (3-ER-432, 466–67.)[3] He did not recall anything from his participation at the event that was not captured by his videos. (3-ER-448.) The following words, broadcast over the loudspeaker, are clearly audible at the beginning of the first video:

---

[3] These videos, and all others referenced herein, were filed with the District Court via thumb drive. (3-ER-428, 466–67.) The City has filed a motion to transmit these videos to this Court.

> "…all those assembled at Eleven and Pine to immediately disperse, which means leave this area. If you do not do so, you may be arrested or subject to other police action. Other police action could include use of chemical agents or less lethal munitions, which may inflict significant pain or result in serious injury. If you remain in the area just described, regardless of your purpose, you will be in violation of city and state law. The following routes of dispersal are available: Westbound on Pine. Southbound on Twelve."

(3-ER-466 at 0:00 to 0:42.) This is substantially identical to the standard text of an SPD Order to Disperse. (4-ER-621.) Failure to disperse after a dispersal order has been given is a misdemeanor. RCW 9A.84.020.

The City's forensic video reconstructionist, created a time-synchronized compilation of BWV[4] from four SPD officers,[5] Mr. Cheairs' video, and a map tracking Mr. Cheairs' location using data from his cell phone video. (3-ER-517–18; 4-ER-556.) Due to the characteristics of the audio recording equipment in Mr. Cheairs' phone, any words audible in the recordings would also

---

[4] Body Worn Video.

[5] The four officers (and their respective camera serial numbers) are: Officer Carl Anderson (X81234678); Officer Joshua Knight (X81242488); Officer Quindelia Washington (X81203293); and Officer Curtis Oh (X81216023). (3-ER-469.)

12

be audible to a human being present on the scene. (4-ER-537.) The timestamps in the video, which are in the upper-right corner of each BWV recording, are seven hours ahead of Pacific Time; consequently, the timestamps correlate to approximately 12:08 a.m. on June 8, 2020 at the beginning of the video. (3-ER-468-69.)

The video compilation depicts Mr. Cheairs (represented on the map by a yellow dot) walking east on Pine Street toward the SPD line over the approximately 40 seconds that Captain Allen can clearly be heard commanding all persons in the 11th and Pine Street area to disperse. (4-ER-556 at 0:00–0:42.) During that time, Mr. Cheairs moved approximately 70 feet *closer* to the police line. (4-ER-538.) Mr. Cheairs' recollection, consistent with videos, is that he walked toward the police line to satisfy his curiosity about the events in the intersection between the protesters and police. (3-ER-449.) Mr. Cheairs moved around the corner of the intersection until he had a clear, unobstructed view of the police line. (3-ER-450.)

At the same time Mr. Cheairs was approaching the police line, the BWV recorded numerous objects being thrown or

13

launched at and impacting either the officers themselves or the ground around their feet. (3-ER-472–74.) A partial list of these objects, with specific times and BWV on which the objects are visible, as well as the native BWV timestamp associated with each BWV, is set forth in the table below:

| Time (compilation) | Time (individual BWV timestamp) | Object Description | Video On Which Object is Visible |
|---|---|---|---|
| 1:06 | T07:09:43Z (both) | Unknown (Officers appear to duck) | Top Right (X81242488); Bottom Right (X81216023) |
| 1:24 | T07:09:43Z (X81234678); T07:10:01Z (X81203293) | Green laser pointer beam. *See* RCW 9A.49.020. | Top Left (X81234678); Bottom Left (X81203293) |
| 1:48 | T07:10:25Z | Green laser pointer beam (2) | Bottom Left (X81203293) |
| 2:27 | T07:11:05Z | Clear/silver object | Bottom Right (X81216023) |
| 2:43-2:44 | T07:11:21Z (all) | Water bottle | All |
| 2:50 | T07:11:28Z (both) | Water bottle | Bottom Left (X81203293); Bottom Right (X81216023) |

| 3:03 | T07:11:41Z | Water bottle | Bottom Right (X81216023) |
|---|---|---|---|
| 3:08 | T07:11:46 (both) | Green laser pointer | Bottom Left (X81203293); Bottom Right (X81216023) |

Each of these objects was thrown at the police line when Mr. Cheairs was standing at the front of the crowd and observing. (3-ER-466–67; 4-ER-556.) Rocks, cans, bottles, and garbage are visible littering the ground in front of the police line, having been thrown earlier in the evening. (4-ER-556.) Many more objects, including fireworks and explosives, were thrown at the SPD line than were captured on video. (4-ER-633–34.) Objects were also being launched in a high arc, visible in the BWV, which reduced officers' ability to see and protect against them and increased the likelihood that officers would be struck in the head, causing serious injury or death. (*Id.*)

As Mr. Cheairs walked toward the SPD line, he saw officers deploying exploding munitions at the crowd. (3-ER-444–45.) He could smell the sulfuric odor of exploding fireworks. (3-ER-446–47.) He could hear a loudspeaker broadcast, although he does not remember what it said. (3-ER-443–44.) Despite the increasingly volatile situation and the

15

orders to disperse, Mr. Cheairs never considered leaving, instead opting to remain, because other protesters around him were likewise defying the dispersal order. (3-ER-451–52.) Mr. Cheairs did not know whether people in the crowd were throwing rocks or bottles at the officers, although he disapproved of such assaults generally. (3-ER-452.)

At approximately 12:10 a.m., about two minutes after the dispersal order heard on Mr. Cheairs' video recordings, the line of police officers advanced toward the intersection in response to continued assaults from the crowd. (4-ER-556 at 1:30; 4-ER-634; 5-ER-791.) At that same time, Captain Allen received reports that the line of officers was being hit with more bottles thrown or launched out of the crowd. (5-ER-790–91.) After the officers advanced, Mr. Cheairs's video shows him moving back slightly before stopping and continuing to film. (4-ER-556 at 1:55–2:11.) In his video, Mr. Cheairs can clearly be seen in the front rank of protesters, with nothing obscuring his camera view of the police line and two individuals who are standing alone in the intersection. (*Id.*) Mr. Cheairs remained there for approximately 40 seconds, until other protesters advanced into

16

his view causing him to again move toward the officers so that nobody was between him and the police. (*Id*. at 2:47–3:11.)

Approximately 10 seconds later, at time mark 3:20 in the compilation video's upper-left corner, Officer Carl Anderson, who the City has identified as the officer who deployed the blast ball that struck Mr. Cheairs, can be seen readying a blast ball for deployment. (*Id.* at 3:20; 3-ER-472 at 0:25:22.) Seconds later, Anderson deploys that blast ball, the path of which is tracked by a red dot and line in the compilation video. (4-ER-556 at 3:23.) According to Officer Anderson's BWV, the blast ball was deployed at timestamp T07:12:01Z, which correlates to 12:12:01 a.m. on June 8, 2020. (*Id*.; 4-ER-472 at 0:25:25.) At time mark 3:24 on the compilation, Mr. Cheairs' video shows the blast ball impacting the ground near the feet of an individual standing in the middle of the intersection who is holding a pink umbrella before bouncing into the air. (3-ER-467 at 0:48; 4-ER-556 at 3:24.) As clearly shown on the compilation video, the trajectory of the blast ball changes after it impacts the ground, deflecting sharply to the north from its original line of travel. (4-ER-556 at 3:24–3:25.) Moments later, this blast ball impacted Mr. Cheairs'

body. (*Id.* at 3:25; 3-ER-467 at 0:49.)

Mr. Cheairs recalls a ball of sparks "[flying] across the ground" before it "hits the curb and it bounces up." (3-ER-455.) The blast ball hit him "directly in the groin" and exploded as it struck him. (*Id.*) Mr. Cheairs described the sensation of being hit as "like getting punched with barbed wire." (3-ER-456.) He drove himself to the hospital where he was examined by emergency room staff. (3-ER-457.) Mr. Cheairs claims he suffered the following injuries: a 3-inch laceration to his upper thigh, a "half-dollar" or larger area of skin which was abraded or burned off the right side of his penis, and lacerations to the front of his penis. (3-ER-458.) Mr. Cheairs' physical injuries completely healed after "about six weeks." (3-ER-459.)

Mr. Cheairs did not see who threw the blast ball that struck him. (3-ER-453.) Mr. Cheairs has no reason to believe that any officer targeted him with the blast ball. (3-ER-454.) Mr. Cheairs concedes that, for police officers in a crowd situation, "it might be difficult to tell" who is and who is not throwing objects at the officers. (3-ER-453.)

Officer Carl Anderson has been a member of the SPD

18

SWAT Team since 2007. (4-ER-717–18.) He received extensive training on use of force, crowd control, and less-lethal munitions including blast balls. (*Id*.) During the June 7-8 incident, Officer Anderson was assigned as a Chemical Agent Response Team (CART) Leader. (4-ER-723.) In that role, his task was to preserve life of protesters and police officers, prevent bodily harm to fellow officers and citizens, and prevent significant property damage. (*Id*.) On that night, Officer Anderson saw numerous objects being thrown at the SPD line including rocks, bottles, and explosives. (4-ER-725.)

During the relevant time on June 8, Officer Anderson deployed a series of four blast balls. (4-ER-725, 738–40, 749–62.) The third of the series struck Mr. Cheairs. (4-ER-556, 725.) Officer Anderson based his decision to deploy the blast ball that struck Mr. Cheairs on the assaultive nature of the crowd, including a glass bottle(s) that had just been thrown at the line moments before. (4-ER-759.) The sound of this glass bottle shattering is audible on Officer Anderson's BWV. (3-ER-472 at 0:25:15.) At the time of this deployment, Officer Anderson was carrying out orders to disperse the crowd. (4-ER-759–60.) The

19

blast ball deployment was necessary to protect Anderson and other officers from being struck by frozen water bottles, chunks of concrete, and other objects with the potential to cause serious injury or death. (*Id*.) Officer Anderson did not target any specific individual; instead, he deployed blast balls to open space consistent with judicially approved SPD training and policy in response to large groups of protesters that were threatening to surround the SPD officers' north flank. (4-ER-719–20, 758–62.) His purpose was to create time and space between the officers and the violent crowd to end assaultive behavior against himself and other officers. (4-ER-725.)

Officer Anderson was disciplined with a letter of reprimand for the fourth blast ball deployment in the series, because OPA[6] interpreted his statements in an interview, (4-ER-761–62), to mean that, because the fourth blast ball hit a person before it landed or bounced, and because Officer Anderson could not remember throwing it, the deployment violated policy. (4-ER-772–77.) Officer Anderson appealed that discipline. (4-ER-719.) OPA observed that when Officer Anderson deployed the

---

[6] Office of Police Accountability

third blast ball, at issue here, the video shows it was aimed at and landed in empty space—consistent with policy and training (4-ER-556, 776.)

During the OPA process, Officer Anderson was interviewed about his rationale for deploying the blast ball that struck Mr. Cheairs. (4-ER-752–68.) Officer Anderson was "continuing to try to push and disperse the crowd that ha[d] been given several dispersal orders, who ha[d] refused to leave the area, refused lawful order to disperse, and . . . continue[d] to assault [officers] with possible deadly force." (4-ER-757.). Because there was a line of officers in front of him, Officer Anderson threw the blast ball overhand. (4-ER-768.)

Officer Anderson prepared his written recollection of the events of that night ten days later, on June 17, 2020, and included notes regarding several uses of force in the span of a few minutes:

> I observed Officers deploying OC spray and blast balls with little effect. I deployed four to five OC muzzle blast rounds from my 40mm multi-launcher towards the front line of the rioters. I then started deploying inert and OC blast balls in between the line Officers and the protesters to move the crowd back from the line and to keep the Officers from being assaulted. We

> were then given the command to start pushing the crowd westbound on Pine St. I clearly heard Cpt. Allen giving dispersal orders over the PA system several times. When we were near the intersection of 11th and Pine, I heard the incident commander give the order to deploy CS to disperse the rioters.
>
> …
>
> I used force multiple times throughout this event. I deployed numerous inert and OC blast ball grenades, 40mm direct impact rounds, 40mm OC muzzle blast rounds, and CS grenades to protect myself and the line Officers from being feloniously assaulted, to create time and distance between the line Officers and the rioters, and to disperse the crowd.

(4-ER-725.)

In his OPA interview, Officer Anderson explained that "[o]n each occasion that [he] used force, [he] made [his] decisions based on specific circumstances that warranted the level of force used to stop the occurrence of crimes" and that he "felt that the resistance and assaultive behavior presented by the rioters were likely to cause injuries to Officers and that hands-on control tactics and other force options would be likely to cause greater injury to the rioters than [his] use of blast balls, CS grenades and direct impact munitions." (4-ER-778) Officer

22

Anderson "was forced to make split-second decisions during extremely tense, uncertain, dynamic and rapidly evolving circumstances. I attempted to only use force that was proportional to the threats and urgency of the situation to disperse the rioters and to keep myself and other Officers safe." (4-ER-726).

### 5. *Unrelated Black Lives Matter Seattle-King County et. Al. v. City of Seattle Litigation and Contempt Order*

On June 9, 2020, after the protest activity described above, Black Lives Matter Seattle-King County and several individuals ("*BLM* Plaintiffs") filed a lawsuit against the City ("*BLM* Litigation"). (Appx.-3–29.)[7] The *BLM* Plaintiffs also brought a motion for a temporary restraining order (TRO) seeking to enjoin the City from "deploying chemical weapons or projectiles of any kind for the purpose of crowd control." (Appx.-30–72.) On June 10, 2020, the City filed a Notice of Intent to File a Response to *BLM* Plaintiffs' motion for a TRO, in which the City proposed

---

[7] The City has filed a motion for this Court to take judicial notice of the documents in the appendix to the City's brief. The appendix contains pleadings from the *BLM* Litigation referenced in the summary judgment and appellate briefing in this matter which may not be available to this Court electronically.

modifications to the language of the *BLM* plaintiffs' proposed order which, if adopted, would allow the City to agree to the TRO. (Appx.-73–80.) The City's language permitted the use of less lethal tools in response to specific acts of violence or by the order of the incident commander. (Appx.-76–77.) In its June 12, 2020 Order, issued five days after the incident involving Mr. Cheairs, the Court granted in part the *BLM* Plaintiffs' TRO motion, adopting most, but not all, of the City's language. (Appx.-81–92; *Black Lives Matter Seattle-King County et al. v. City of Seattle, Seattle Police Department ("BLM I")*, 466 F. Supp.3d 1206 (W.D. Wash., June 12, 2020).) While the Court found that the BLM plaintiffs had demonstrated a clear likelihood of success on the merits of their First and Fourth Amendment claims, the Court's Order permitted individual officers to use less lethal tools in response to imminent threats to safety or property. (Appx.-84–89, 91.) The Order enjoined "indiscriminate" use of tear gas and untargeted deployments of less lethal tools like blast balls. (Appx.-91.) On June 17, 2020, the parties stipulated to conversion of the TRO into a preliminary injunction, effective through September 30. (Appx.-93–95.)

After the entry of the preliminary injunction, daily protest activity continued. On July 25, 2020, another protest occurred, with the City using less lethal tools to disperse the crowd (Appx.-99.) On July 27, 2020, the *BLM* Plaintiffs brought a motion to show cause why the City should not be held in contempt for violating the June 17 injunction. (Appx.-96–111.) Rather than hold a hearing on that issue, the parties stipulated to the entry of an additional Order adding additional protections for members of the public. (Appx.-112–120.) Subsequently, on September 30, 2022, the *BLM* Plaintiffs brought a second motion to show cause, claiming SPD's less lethal deployments at protests on August 26, September 7, September 22, and September 23, 2022 violated the injunction's terms. (Appx.-121–136.) The Court's December 7, 2020 Order granted the *BLM* Plaintiffs' contempt motion in part and denied it in part. (Appx.-137–163; *Black Lives Matter Seattle-King Cnty. v. Cty. of Seattle ("BLM II")*, 505 F. Supp.3d 1108 (W.D. Wash. Dec. 7, 2020).) The Court's Order was lengthy, but as pertinent here, it identified five uses of less lethal tools that violated the Preliminary Injunction, including four blast ball deployments. (Appx.-149, 151, 154, 156–58, 160–62.)

With respect to the blast ball deployments, the court found that they were either insufficiently targeted or not made in response to an "imminent threat" as required by the Preliminary Injunctions to which the parties had agreed. (Appx.-156–58.) Because the court was analyzing only whether specific deployments of less lethal tools violated the terms of the operative injunctions, the court did not analyze larger questions of constitutionality and police tactics in its Order. (Appx.-137–39.)

The TRO and Contempt Order neither reference nor in any way relate to the specific events at issue in this lawsuit. The TRO entered on June 12, 2020, cited the declarations of Alexandra Chen, Nathalie Graham, and Omari Salisbury to reach the preliminary finding that SPD may have used less lethal tools disproportionately. (Appx.-64–72, 82–83, 85–87; 2-ER-216–17, 19–22.) Those declarations relate to such events on May 30, June 1, and June 2 only. (Appx.-64–65, 67–68, 71–72.) The TRO only references the events of June 8 for the purpose of establishing that some protests occurred near the East Precinct. (Appx.-85; 2-ER-219.) The District Court did not reach any finding with

26

respect to the particularized actions of SPD on June 7-8, let alone the deployment of the blast ball that injured Mr. Cheairs. (Appx.-84–90; 2-ER-218–24.) Further, the BLM Plaintiffs' motion for a TRO includes factual allegations related to the events of June 7-8 solely as to the use of tear gas. (3-ER-344.) Mr. Cheairs was not exposed to tear gas and any use of it is not at issue in this lawsuit. (5-ER-850–56.)

The situation is the same with respect to the Contempt Order. By its terms, that Order covers the "use of four weapons…during four protests" on August 26, September 7, September 22, and September 26. (2-ER-228.) Nothing in that Order referenced the events of June 7-8. (2-ER-228–54.) That order did not hold that use of all blast balls in a crowd setting is unconstitutional. (*Id.*)

## B. Procedural Background

Mr. Cheairs filed his Complaint in the District Court on October 1, 2021. (5-ER-850–57.) Mr. Cheairs asserted claims under 42 U.S.C. §1983 for violations of his Fourth and First Amendment rights. (5-ER-855–56.) Mr. Cheairs did not specifically allege a *Monell* claim, nor did he name any

individual officers as defendants. (5-ER-850, 855–56.) The City filed its answer on November 10, 2021. (5-ER-843–49.) Despite having received the identity of the officer who deployed the blast ball at issue more than a month prior, (2-ER-173 n. 3), Mr. Cheairs did not amend his Complaint to name any specific officers before the deadline to amend the pleadings passed on June 30, 2022. (1-ER-19–20, 33 n. 11; 2-ER-147–48.)

On February 6, 2023, the City filed its motion for summary judgment. (5-ER-813–42.) The following day, the City filed a praecipe and corrected version of its motion. (SER-3–32.) As to Mr. Cheairs' Fourth Amendment claim, the City asserted his claim failed because he was not intentionally seized. (SER-19–22.) As to the First Amendment claim, the City argued the claim failed because the officers' actions were in response to violent actions and assaults by the crowd, and not directed at Mr. Cheairs. (SER-22–23.) Last, even assuming Mr. Cheairs did plead a *Monell* claim, the City argued any *Monell* theory also failed as a matter of law because: (a) the events of the *BLM* litigation did not establish any unconstitutional policy or custom, (b) the City's training on demonstration management and crowd

28

control is extensive, and (c) there is no evidence any final policymaker ratified some unconstitutional conduct at issue in this lawsuit. (SER-23–27.)

On March 17, 2023, Mr. Cheairs filed his response to the City's motion. (2-ER-158–185.) On his Fourth Amendment claim, Mr. Cheairs' argued the blast ball that accidentally struck him was excessive force, but did not argue that he was intentionally targeted. (2-ER-173–76.) Similarly, on his First Amendment claim, Mr. Cheairs argued the events of June 7-8 generally showed SPD's intent to use force against the crowd, and by extension force against him. (2-ER-177–78.) Last, on his *Monell* claim, Mr. Cheairs argued: (a) the events of the *BLM* litigation and the fact SPD's policies were subject to federal court review was evidence any such policies were unconstitutional, (b) the fact SPD policies were subject to federal court review meant all SPD training was deficient, and (c) SPD's Incident Action Plan (IAP) and statements by Mayor Durkan about the events of June 7-8 amounted to ratification of the officers' actions, and missing text messages from City officials in unrelated litigation created an inference of ratification. (2-ER-178–184.)

On April 3, 2023, the City filed its reply. (2-ER-142–56.) On the Fourth Amendment claim, the City emphasized how there was no evidence Mr. Cheairs was intentionally targeted, nor was his freedom of movement restrained, and he was thus never seized. (2-ER-148–50.) Similarly, to the extent Mr. Cheairs was even protesting on June 7-8, his speech was not chilled by his injuries (he has since attended other protests), nor were his activities on June 7-8 a substantial or motivating factor in the officers' actions. (2-ER-51, 150–52.) On his *Monell* claim, this City argued the rigorous review and vetting process SPD has been subject to since 2011 belies any argument its policies are unconstitutional or that its training is deficient. (2-ER-152–54.) Further, Mr. Cheairs did not identify a final policymaker, and to the extent he pointed to statements from Mayor Durkan or SPD Chief Best, those statements did not ratify SPD's actions. (2-ER-155.) The City also produced text messages in this litigation, none of which were used by Mr. Cheairs in his response to the summary judgment motion. (2-ER-155–56.)

On April 24, 2024, the District Court granted the City's motion. (1-ER-3–34.) The Court found Mr. Cheairs failed to

establish a genuine issue of material fact on necessary elements on his Fourth and First Amendment claims, which also precluded any liability on his *Monell* claim. (1-ER-23.) On the Fourth Amendment claim, the District Court emphasized how the officers did not act with any intent to restrain Mr. Cheairs nor anyone else and were instead trying to get the crowd to disperse. (1-ER-24–27.) The Court also held Mr. Cheairs failed to meet his burden to provide evidence the officers intended to restrain him personally by only arguing that the use of blast balls was excessive force. (*Id.*) Similarly, on the First Amendment claim, the District Court found Mr. Cheairs failed to raise a genuine dispute as to whether he was engaged in constitutionally protected activity or whether any such activity was a factor in the officers' actions. (1-ER-28–30.) Mr. Cheairs did not dispute he was in violation of a dispersal order at the time of his injuries (a misdemeanor offense), nor did he dispute that Officer Anderson threw the blast ball to protect other officers and disperse the crowd rather than to target any specific person. (1-ER-30–33.) Last, because there was no constitutional violation, any *Monell* claim failed as a matter of law. (1-ER-33.) The District Court

entered a judgment for the City that same day. (1-ER-2.) Mr. Cheairs timely appealed to this Court. (5-ER-889–90.)

## V.    SUMMARY OF ARGUMENT

The City respectfully requests this Court affirm the District Court's grant of summary judgment dismissing all of Mr. Cheairs' claims with prejudice. Mr. Cheairs' Fourth Amendment claim was properly dismissed because he was not seized as there is no evidence any officer sought to restrain him or intentionally seize him when deploying the blast ball. Further, given the violence the officers were facing, the use of the blast ball was neither unreasonable nor excessive as a matter of law. Mr. Cheairs' First Amendment claim was properly dismissed because it is undisputed that he failed to comply with a dispersal order, which is not constitutionally protected activity. Moreover, his First Amendment claim is unsupported by any evidence that Officer Anderson acted with retaliatory animus when deploying the blast ball. As Mr. Cheairs constitutional rights were not violated, the District Court properly dismissed his *Monell* claim. Further, even if there was evidence of a constitutional violation, there is no evidence that an unconstitutional policy, practice, or

custom was the moving force behind deployment of the blast ball, nor evidence to support *Monell* liability under any theory.

## VI.   STANDARD OF REVIEW

This Court reviews a grant of summary judgment de novo "to determine whether a rational trier of fact might resolve the issue in favor of the nonmoving party." *S.R. Nehad v. Browder*, 929 F.3d 1125, 1132 (9th Cir. 2019) (quoting *Blankenhorn v. Cty. of Orange*, 485 F.3d 463, 470 (9th Cir. 2007)); *Sandoval v. Cnty. of Sonoma*, 912 F.3d 509, 515 (9th Cir. 2018). This review is governed by the same standard used by trial courts under Fed. R. Civ. P. 56(c). *Szajer v. Cty. of Los Angeles*, 632 F.3d 607, 610 (9th Cir. 2011). Summary judgment is appropriate when, viewing the facts in the light most favorable to Mr. Cheairs, there is no genuine issue of material fact which would preclude the entry of judgment as a matter of law. Fed. R. Civ. P. 56(a). Mr. Cheairs must present significant and probative evidence to support his claims, and factual disputes whose resolution would not affect the outcome of this suit are irrelevant on summary judgment. *Arpin v. Santa Clara Valley Transp. Agency,* 261 F.3d 912, 919 (9th Cir. 2001); *see also Intel Corp. v. Hartford*

*Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991).

This Court also reviews de novo whether there was a seizure in violation of the Fourth Amendment. *Sandoval*, 912 F.3d at 515; *Martinez v. Nygaard*, 831 F.2d 822, 826 (9th Cir. 1987).

## VII.  ARGUMENT

### A. Mr. Cheairs' Fourth Amendment Claim Fails Because He was Never Seized because Officer Anderson did not Restrict Mr. Cheairs' Freedom of Movement nor Seek to Restrain him when Deploying the Blast Ball.

The Fourth Amendment protects individuals against unreasonable searches and seizures. Mr. Cheairs asserts SPD's use of force was objectively excessive, rendering that force an unreasonable seizure within the meaning of the Fourth Amendment. However, this Court first determines if an individual was seized within the meaning of the Fourth Amendment before addressing whether an officer's alleged use of force was unreasonable or excessive. *Sanderlin v. Dwyer*, __ F.4th __, 2024 WL 4033065, *4 (9th Cir. 2024); *Seidner v. de Vries*, 39 F.4th 591, 596 (9th Cir. 2022). Mr. Cheairs was not seized because Officer Anderson did not restrict his freedom of movement nor seek to restrain him. Further, given the violent

34

assaults law enforcement was facing, the use of the blast ball was neither unreasonable nor excessive. [8]

### 1.    *Mr. Cheairs was not Seized.*

"A seizure triggering the 4th Amendment occurs only when government actors have, by means of physical force or show of authority, in some way restrained the liberty of a citizen." *Graham v. Connor*, 490 U.S. 386, 394 n. 10, 109 S. Ct. 1865 (1989); *see also Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S. Ct. 1868 (1968). Only restraint by physical force is at issue here. (1-ER-24.) Further, "violation of the Fourth Amendment requires an intentional acquisition of physical control."

---

[8] Mr. Cheairs also asserts the District Court failed to properly analyze his claims by relying on a "waiver theory." (Appellant's Opening Brief, pp. 36-37.) The District Court did not rely on any waiver theory and instead issued a detailed order on the merits explaining why Mr. Cheairs' claims all fail as a matter of law. Further, the District Court was correct that Mr. Cheairs failed to respond to the City's specific arguments (*i.e.*, that he was not intentionally targeted, nor restrained in any way) and instead focused solely on excessive force, (1-ER-25–26; 2-ER-148–150, 173–76; SER-19–21), which he continues to do on appeal. To the extent Mr. Cheairs may seek to address such issues in future briefing, he is limited as he may not raise new issues for the first time on appeal nor in a reply brief. *Raich v. Gonzales*, 500 F.3d 850, 868 (9th Cir. 2007); *Eberle v. Cty. of Anaheim*, 901 F.2d 814, 818 (9th Cir. 1990).

> It is clear, in other words, that a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), nor even whenever there is a governmentally caused and governmentally ***desired*** termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement ***through means intentionally applied***.

*Brower v. Cnty. of Inyo*, 489 U.S. 593, 596-97, 109 S. Ct. 1378 (1989) (emphasis in original); *see also Jurkowski*, C15-1155 TSZ, 2017 WL 4472859, at *8 (holding no seizure occurred when blast ball detonated near protestor because the plaintiff continued to run away, and, therefore, his freedom of movement was not restricted.)

Not every contact between a law enforcement officer and a citizen is a seizure. *Torres v. Madrid*, 592 U.S. 306, 317, 141 S. Ct. 989 (2021). "A seizure requires the use of force *with intent to restrain*. Accidental force will not qualify." *Id.* (emphasis in original). "Nor will force intentionally applied for some other purpose satisfy this rule." *Id.*; *see also Dundon v. Kirchmeier*, 577 F. Supp. 3d 1007, 1040-42 (D. N.D. 2021) (no seizure occurs where officers deploy blast balls to turn away protesters who are

36

advancing on them). Courts must look at whether the challenged conduct objectively manifests an intent to restrain, without consideration of the subjective motivations of the officer. *Torres*, 592 U.S. at 317.

Mr. Cheairs cannot and does not dispute that, far from being restrained by the blast ball, he continued walking and moving after being struck and had no contact with SPD officers. (1-ER-27; 3-ER-455–59.) Officer Anderson did not terminate Mr. Cheairs' freedom of movement through means intentionally applied. There is also no evidence that the blast ball impacted Mr. Cheairs as a result of an intentional act, rather than an accidental one. Indeed, Mr. Cheairs recognizes in his opening brief that "the evidence shows that Officer Anderson did not visualize any specific target when he deployed the [blast ball]." (Appellant's Opening Brief at 32.) He therefore agrees Officer Anderson never intended to seize him.

Mr. Cheairs does not dispute that the officers were being violently assaulted by rocks, bottles, fireworks, and lasers by the crowd. The video evidence upon which he relies clearly shows this. The officers' actions are "entirely consistent with an intent

to prompt the crowd to leave without attempting to apprehend or otherwise restrain anyone." (1-ER-27.) Because neither Officer Anderson nor any other officer had any intent to restrict Mr. Cheairs' movement or otherwise restrain him, he was not seized.

### 2. *The Force Used Was Neither Unreasonable nor Excessive.*

Given the violence encountered by Officer Anderson and other officers in the vicinity, it cannot be disputed that the use of the blast ball was reasonable. Excessive force claims are evaluated under the Fourth Amendment's reasonableness standard, and a court considers "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (quoting *Graham*, 490 U.S. at 396). This Circuit also considers the availability of alternative methods of capturing or subduing a suspect. *Id.* at 703. Additionally, reasonableness is assessed from the perspective of an objectively reasonable officer on the scene, rather than with the 20/20 vision of hindsight, and must allow for the fact that "police officers are often forced to make split-second

judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397.

Mr. Cheairs baldly asserts the officers were only facing passive resistance from the crowd on June 7-8, 2020. But he presents no evidence sufficient to create a genuine dispute as to facts that officers were being violently assaulted by rocks, bottles, fireworks, and lasers. This posed a major threat to officer and public safety and cannot be characterized as passive resistance or no threat to officer safety. It is also undisputed that use of blast balls is a reasonable and widely accepted means of attempting to stop assaults from large crowds. (3-ER-506–13; 4-ER-557–58.) Captain Allen gave lawful dispersal orders, and the crowd refused to obey them, instead continuing to barrage the officers with projectiles. Officer Anderson reasonably utilized blast balls to move the crowd and get distance in order to stop the assaults.

Mr. Cheairs cites *Young v. County of Los Angeles*, 655 F.3d 1156 (9th Cir. 2011), and *Nelson v. City of Davis*, 685 F.3d 867 (9th.Cir. 2012), for the proposition that the use of less lethal

force to disperse protestors violates the Fourth Amendment, even when the protestors fail to heed police warnings. But *Young* addressed the use of pepper spray and baton strikes on a motorist who had exited his vehicle and refused to get back in it during a traffic stop. 655 F.3d at 1158. It has no application here. While *Young* briefly mentions *Headwaters Forest Defense v. Cnty. of Humboldt*, 276 F.3d 1125 (9th Cir. 2002), that case addressed the use of pepper spray on non-violent protestors who passively refused to unlink themselves and vacate the premises. 276 F.3d at 1127-29. Similarly, *Nelson* involved a large college party where attendees "haphazardly" threw bottles and other items at police, none of which came from the area where the plaintiff was standing. 685 F.3d at 872-74, 880. All three cases are a far cry from the active assaults of a violent crowd throwing rocks, bottles, and fireworks that the officers faced on June 7-8, 2020, facts which Mr. Cheairs does not dispute, and a crowd Mr. Cheairs was standing in front of before being struck by the blast ball. Moreover, the cases Mr. Cheairs relies on involve situations where officer(s) deliberately targeted a person or group of persons, and then intentionally applied force. *Young*, 655 F.3d at

1159-60; *Headwaters*, 276 F.3d at 1128-30; *Nelson*, 685 F.3d at 877. But here, the undisputed facts show the officers were not targeting Mr. Cheairs, nor any other person, but were instead trying to create space and get the crowd to disperse pursuant to a lawful order. Mr. Cheairs fails to cite a single case with similar facts that holds the use of blast balls in response to assaults and in order to disperse a crowd pursuant to a lawful dispersal order violates the Fourth Amendment. This Court should affirm the dismissal of Mr. Cheairs' Fourth Amendment claim.

## B. Mr. Cheairs' First Amendment Claim was Properly Dismissed because there is No Evidence the Officers acted with Any Retaliatory Animus when Deploying the Blast Ball.

The First Amendment protects a significant amount of verbal criticism and challenge directed at police officers. *City of Houston, Tex. v. Hill,* 482 U.S. 451, 461, 107 S. Ct. 2502 (1987). Government officials may not exclude persons from public places engaged in peaceful expressive activity solely because the government actor fears, dislikes, or disagrees with the views those persons express. *Wood v. Moss*, 572 U.S. 744, 756-57 134 S. Ct. 2056, 2066 (2014). "It is equally plain that the fundamental right to speak secured by the First Amendment does not leave

people at liberty to publicize their views "'whenever and however and wherever they please.'" *Id.* (*citing United States v. Grace,* 461 U.S. 171, 177–78, (1983) (quoting *Adderley v. Florida,* 385 U.S. 39, 48 (1966)). "The Supreme Court has declared that '[i]t is a traditional exercise of the States' police powers to protect the health and safety of their citizens.'" *Menotti v. City of Seattle*, 409 F.3d 1113, 1131 (9th Cir. 2005) (*quoting Hill*, 530 U.S. at 751).

Cities have a duty to maintain and restore public order in the face of violent protest. *Menotti*, 409 F.3d at 1131. Government officials may stop or disperse public demonstrations or protests where "clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears[.]" *Cantwell v. Connecticut*, 310 U.S. 296, 308, 60 S. Ct. 900 (1940); *see also Cox v. State of La.*, 379 U.S. 536, 554, 85 S. Ct. 453 (1965). "[W]here demonstrations turn violent, they lose their protected quality as expression under the First Amendment." *Grayned v. City of Rockford*, 408 U.S. 104, 116, 92 S. Ct. 2294 (1972). *See also Feiner v. New York*, 340 U.S. 315, 321, 71 S.

Ct. 303 (1951) ("It is one thing to say that the police cannot be used as an instrument for the suppression of unpopular views, and another to say that, when as here the speaker passes the bounds of argument or persuasion and undertakes incitement to riot, they are powerless to prevent a breach of the peace.").

Consistent with the above principles, Washington makes it a misdemeanor offense when a person "congregates with a group of three or more other persons and there are acts of conduct within that group which create a substantial risk of causing injury to any person, or substantial harm to property" and "refuses or fails to disperse when ordered to do so by a peace officer or other public servant engaged in enforcing or executing the law." RCW 9A.84.020(1)(a)-(b); *see also State v. Dixon*, 78 Wn.2d 796, 808-11, 479 P.2d 931 (Wash. 1971) (holding predecessor statute to RCW 9A.84.020 is constitutional.)

Generally, the First Amendment prohibits officials from subjecting an individual to retaliation for engaging in protected speech. *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019). To establish a First Amendment retaliation claim, plaintiff must show that (1) he was engaged in a constitutionally protected

activity, (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity, and (3) the protected activity was a substantial or motivating factor in the defendant's conduct. *Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 770 (9th Cir. 2006); *BLM Seattle-King Cnty.*, 466 F. Supp. 3d at, 1212. Critically, a plaintiff must ultimately prove that the officer's desire to chill their speech was a but-for cause of the allegedly unlawful conduct. *See Lacey v. Maricopa County*, 693 F.3d 896, 916-17 (9th Cir. 2012) (en banc).

### 1. *Mr. Cheairs Does Not Dispute He Was in Violation of RCW 9A.84.020, which is Not Constitutionally Protected Activity.*

The City does not dispute that filming a police protest can be constitutionally protected activity. *Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817, 827 n. 4 (9th Cir. 2020); *Fordyce v. Cty. of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995). But, Mr. Cheairs does not and cannot dispute that, as captured on the videos, Captain Allen gave repeated and clearly audible orders to disperse before Mr. Cheairs was injured. Mr. Cheairs admits he heard the dispersal orders. (3-ER-422.)

Indeed, his own video captured a dispersal order 201 seconds prior to him being struck by the blast ball. (4-ER-539.) Despite having over three minutes to do so, Mr. Cheairs did not comply with the orders to leave the area, which is a violation of RCW 9A.84.020. There is no First Amendment right to remain in an area once a lawful dispersal order has been given. *See Colten v. Kentucky,* 407 U.S. 104, 109 (1972); *Cervantes v. San Diego Police Chief Shelley Zimmerman*, No. 17-CV-01230-BAS-AHG, 2020 WL 5759752, \*7 (S.D. Cal. Sept. 28, 2020); *Hicks v. City of Portland*, No. CV 04-825-AS, 2006 WL 3311552, \*12 (D. Or. Nov. 8, 2006). Because Mr. Cheairs was committing a misdemeanor crime at the time of his injury, he was not engaged in constitutionally protected activity. But even if Mr. Cheairs was engaged in constitutionally protected activity, his First Amendment claim would still fail given the lack of any retaliatory animus on the part of the officers when deploying the blast ball.

### 2. Mr. Cheairs' Actions were Neither a Motivating Nor Substantial Factor in Officer Anderson's Decision to Deploy the Blast Ball.

Mr. Cheairs asserts the officers were generally targeting

protestors on June 7-8, and that this violated his First Amendment rights. (Appellant's Opening Brief, p. 35.) However, he admits that Officer Anderson did not intend to hit him, and did not even know he was there. (2 ER 162; 3 ER 453-54.) Most importantly, Mr. Cheairs does not present a shred of evidence of retaliatory intent.[9] *Nieves v. Bartlett*, 587 U.S. 391, 408, 139 S. Ct. 1715 (2019) (affirming summary judgment on a retaliation claim because the record contained no evidence about an arresting officer's motivations); *Cervantes*, 2020 WL 5759752, at *9 (finding that plaintiff did not establish the third element of his retaliation claim when underlying reports showed officer's motivations were to enforce a dispersal order, not retaliation.) In fact, Mr. Cheairs does not even allege in his

---

[9] The District Court found Mr. Cheairs failed to address the City's argument his violation of the dispersal order was not constitutionally protected activity and that he failed to show animus by the officers. (1-ER-28–29.) Nonetheless, the District Court analyzed both issues on the merits and did not rely on any waiver theory to dismiss Mr. Cheairs' First Amendment claim. (1-ER-30–33.) Moreover, Mr. Cheairs still does not address the City's argument as to animus in opening brief, instead focusing solely on the issue of protected activity. As with his Fourth Amendment claim, he may not raise new issues for the first on appeal nor in a reply brief. *Raich*, 500 F.3d at 868; *Eberle*, 901 F.2d at 818.

Complaint that any of the officers deployed blast balls due to anyone engaging in protected activities. (5-ER-850–57.)

Instead, Mr. Cheairs relies on *Collins v. Jordan*, 110 F.3d 1363 (9th Cir. 1996), to argue any use of force against protestors or those filming a protest presumptively violates the First Amendment. But *Collins* involved a situation where law enforcement prohibited all protestors from gathering and ordered those assembled to disperse before any protest began and when no violence had occurred. 110 F.3d at 1367-68. Here, it is undisputed the protest was underway and the officers were under assault from multiple individuals in the crowd throwing rocks, bottles, and other projectiles *before* any blast balls were deployed. It is also undisputed Officer Anderson and others deployed blast balls with the intent to create separation and space between the officers and crowd and with the intent to move the crowd to disrupt ongoing assaults. Thus, there is no evidence of any retaliatory animus against Mr. Cheairs or the crowd for any anti-police signs or words. And Mr. Cheairs' assertion that a law enforcement officer presumptively always has retaliatory animus against those protesting law enforcement lacks any legal or

47

factual support. This Court should affirm the dismissal of Mr. Cheairs' First Amendment claim.

## C. Mr. Cheairs Cannot Establish *Monell* Liability because there is No Evidence of Any Unconstitutional Policy, Custom, or Practice to Establish Municipal Liability.

Because Mr. Cheairs cannot show violations of his First or Fourth Amendment rights, any *Monell* claims fail as a matter of law.[10] *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 692, 98 S. Ct. 2018 (1978); *Quintanilla v. City of Downey*, 84 F.3d 353, 355 (9th Cir. 1996) (absent a constitutional violation, there can be no municipal liability under 42 U.S.C. § 1983). But, even assuming there is a genuine issue of fact as to any First or Fourth Amendment violation (there is not), there is no evidence to

---

[10] Though the District Court did not address the issue, Mr. Cheairs' Complaint fails to plead the elements of a claim for municipal liability under 42 U.S.C. § 1983. *See Cantu v. City of Portland*, 3:19-CV-01606-SB, 2020 WL 2952972, at *4 (D. Or. June 3, 2020) (explaining how a complaint must "contain sufficient factual allegations to plausibly suggest a policy or custom, as opposed to merely random, unconnected acts of misconduct ....") (quoting *Estate of Osuna v. Cty. of Stanislaus*, 392 F. Supp. 3d 1162, 1174 (E.D. Cal. 2019). Mr. Cheairs' Complaint does not allege any factual allegations showing that a policy or custom was the moving force behind any alleged constitutional deprivations he suffered. (5-ER-582–56), and the Court could affirm dismissal of his claims on that basis alone.

48

support municipal liability.

A local government cannot be held liable under 42 U.S.C. § 1983 solely because it employs a tortfeasor. *Monell*, 436 U.S. at 692. Instead, a plaintiff seeking to establish municipal liability must demonstrate the governmental entity "had a deliberate policy, custom, or practice that was the moving force behind the constitutional violation suffered." *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1096 (9th Cir. 2013) (quoting *Galen v. County of Los Angeles*, 477 F.3d 652, 667 (9th Cir. 2007) (internal quotation omitted)). To do so, a plaintiff must establish that the alleged unconstitutional action was either: (1) the result of an unconstitutional custom or policy; (2) the result of a deliberate indifference to a known need to train; or (3) ratified by the City's chief policymaker. *See Hopper v. City of Pasco*, 241 F.3d 1067, 1083 (9th Cir. 2001). "Pointing to a municipal policy action or inaction as a but-for cause is not enough to prove a causal connection under *Monell*." *Van Ort v. Estate of Stanewick*, 92 F.3d 831, 837 (9th Cir. 1996). The policy must be the proximate cause of the § 1983 injury. *Id.* Further, "Violation of a police departmental regulation," without more, "is insufficient for

liability under section 1983." *Case v. Kitsap County Sheriff's Dep't.,* 249 F.3d 921, 929 (9th Cir. 2001) (quoting *Wilson v. Meeks,* 52 F.3d 1547, 1554 (10th Cir. 1995) and citing additional authority). As set forth above, there was no constitutional violation, so there can be no *Monell* liability. *Yousefian v. City of Glendale*, 779 F.3d 1010, 1016 (9th Cir. 2015). Nor does any theory support *Monell* liability against the City.

### 1. There is No Unconstitutional Custom or Policy that Supports a Monell Claim.

A municipality "may be held liable 'when implementation of its official policies or established customs inflicts the constitutional injury.'" *Clouthier*, 591 F.3d at 1249 (citing *Monell*, 436 U.S. at 708 (Powell, J. concurring)). An unconstitutional policy need not be formal or written to create municipal liability under § 1983; however, it must be so permanent and well settled as to constitute a custom or usage with the force of law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68, 90 S. Ct. 1598 (1970). Further, "[a] plaintiff cannot prove the existence of a municipal policy or custom based solely on the occurrence of a single incident of unconstitutional action by an employee." *Davis v. City of Ellensburg*, 869 F.2d 1230,

1233-34 (9th Cir. 1989). For a custom to constitute official policy, "it must be so persistent and widespread that it constitutes a permanent and well-settled city policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). To create liability, a custom must be founded on practices of "sufficient duration, frequency, and consistency" such that it is the "traditional method of carrying out policy." *Id.* Moreover, the allegedly unconstitutional custom or policy cannot be pled with such a high level of generality that "anything the police did might fall into that category." *See Sanderlin v. City of San Jose*, No. 20-cv-04824-BLF, 2021 WL 2662094 at *3 (N.D. Cal. Jun. 29, 2021).

Mr. Cheairs generally asserts that because SPD's policies have been reviewed and scrutinized by a federal court, a monitor, OPA, and other organizations, SPD's policies are presumptively unconstitutional and his *Monell* claim should go to a jury. (Appellant's Opening Brief, p. 39.) This is not evidence of an unconstitutional custom or policy. First, the *BLM* Litigation did not address the conduct at issue in this case. SPD was held to be in contempt with respect to force used in three distinct instances in September 2020 – three months *after* the June 7, 2020 incident

at issue here. (Appx.-137; *BLM II*, 505 F. Supp.3d at 1112.) The court in the *BLM* litigation made no findings about the specific facts of the deployment that hit Mr. Cheairs. Further, that court made no adverse findings about deployments which—like the one at issue here—were made directly in response to acts of violence; rather the court in that case found fault with situations in which officers used weapons "indiscriminately" against all protestors. (Appx.-87–88; *BLM I*, 466 F. Supp.3d at 1214-15; *BLM II*, 505 F. Supp.3d at 1119-20, 22-24.) Indeed, the TRO issued in the *BLM* litigation explicitly allowed "individual officers [to take] necessary, reasonable, proportional, and targeted action to protect against a specific imminent threat of physical harm to themselves or identifiable others or to respond to specific acts of violence or destruction of property." (Appx.-91; *BLM I*, 466 F. Supp.3d at 1216.) It is undisputed that Officer Anderson deployed the blast ball into empty space and in response to specific imminent threats of physical harm to himself and other officers. He did not target Mr. Cheairs. The blast ball undisputedly struck him by accident. Consistent with this distinction, in a subsequent ruling addressing blast ball

deployments, Judge Jones held that a number of deployments did not violate his order because they were aimed "near protestors but still on the street" and in response to "a specific act of violence." (Appx.-155; *BLM II*, 505 F. Supp.3d at 1122.)

Mr. Cheairs also argues without legal or factual support that the eight days preceding June 7 amount to an unconstitutional custom or policy of indiscriminate blast ball use, nor has he pointed to any specific blast ball deployments in that time that were actually found to be unconstitutional. (Appellant's Opening Brief, pp. 39-40.) Further, during the handful of days the BLM protests had been ongoing before June 7-8, SPD's tactics were evolving and adapting to the circumstances the officers faced nightly. Where a city's conduct is ever shifting in response to changing directives from leadership, public pressure, and eventually court orders, that conduct cannot be "permanent and well-settled" such that it evidences a custom of "sufficient duration" or "consistency" that it becomes tradition bearing the force of law. *Trevino*, 99 F.3d at 918. Indeed, to the extent the City's conduct evidenced any consistent policy with respect to protests, it was to attempt to come to grips with extremely

difficult and unprecedented levels of violence while evolving its police tactics in an effort to avoid constitutional violations.

Last, by failing to state what conduct it was that allegedly constituted an "unconstitutional custom or policy," and instead encouraging this Court to infer one, Mr. Cheairs' *Monell* claim is so generalized that essentially *any* use of less lethal tools in response to a protest, regardless of circumstances, might plausibly subject the City to liability. That is not the law. Mr. Cheairs has not and cannot establish an unconstitutional custom or policy that served as the moving force behind Officer Anderson's use of a blast ball during the course of the June 7-June 8 protest.

> **2. There was No Deliberate Indifference to a Known Need to Train Given the City's Comprehensive Policies and Training that were Approved by the Monitor and a Federal Court.**

There is also no evidence to support a claim the City was deliberately indifferent to a known need to train its officers. A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011). "A pattern of similar constitutional violations by untrained employees is 'ordinarily

necessary' to demonstrate deliberate indifference for purposes of failure to train." *Id*. at 1360 (*citing Bd. of the Cty Comm'rs*, 520 U.S. at 409). The "deliberate indifference" standard is met when "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton v. Harris*, 489 U.S. 378, 390, 109 S. Ct. 1197 (1989). Deliberate indifference requires that the municipality have actual or constructive notice that its omission would likely result in a constitutional violation. *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1145 (9th Cir. 2012).

Mr. Cheairs does not specifically address this theory in his brief. (Appellant's Opening Brief, pp. 37-40.) He therefore concedes there is no evidence to support such a theory and has waived any argument on it. It is readily apparent Mr. Cheairs cannot meet the exceptionally high bar required to sustain a *Monell* claim under this theory. The City's training on demonstration management and crowd control techniques is at the forefront of the nation, and there is no evidence anywhere in

55

the record to suggest cities should not be using blast balls as part of their comprehensive protest management plan. (3-ER-506–13.) Moreover, the City's policies and training were vetted by the Federal Monitor for constitutionality and adherence to national best practices and were approved by the U.S. District Court for the Western District of Washington. This conclusive evidence of the *constitutionality* of the City's policies and training in place on June 7-8 shows the opposite of deliberate indifference.

### 3. The City did not Ratify any Constitutional Violations.

A municipality may also be liable under 42 U.S.C. § 1983 for a constitutional violation if the municipal policymaker "ratified" that decision. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986); *Christie v. Iopa*, 176 F.3d 1231, 1238 (9th Cir. 1999). The policymaker's knowledge of an unconstitutional act does not, by itself, constitute ratification. *Christie*, 176 F.3d at 1239. Municipal liability under this theory attaches only when the policymaker possesses final authority to establish municipal policy with respect to the action ordered, when the policymaker makes a deliberate choice from among various alternatives to follow a particular course of action, and when the policymaker

approves the subordinate's decision and the basis for it. *Gillette v. Delmore*, 979 F.2d 1342, 1348 (9th Cir. 1992); *see Salvato v. Miley*, 790 F.3d 1286, 1296 (11th Cir. 2015) (when plaintiffs rely on a single incident, they must demonstrate that local government policymakers had an opportunity to review the subordinate's decision before it was final and agreed with both the decision and the decision's basis before a court can hold the government liable.) The ratifying decision must be one that is the product of a "conscious, affirmative choice" to ratify the conduct in question. *Haugen v. Brosseau,* 339 F. 3d 857, 875 (9th Cir. 2003) (opinion amended and judgment vacated on other grounds) (*citing Gillette,* 979 F.2d at 1347).

Once again, Mr. Cheairs does not specifically address this theory in his brief. (Appellant's Opening Brief, pp. 37-40.) There is no evidence that the City's final policymaker ratified the blast ball deployment that injured Mr. Cheairs. Mr. Cheairs has not even identified a final policymaker, and, therefore, has not met his burden on this claim. Below, he argued SPD's IAP from June 7 was evidence of ratification, but the IAP is just an incident plan utilized by SPD *before* the events that evening to brief officers

57

on various aspects of the event and what tactics that may be employed. The IAP is not in any way, shape, or form a ratification of an unconstitutional act as contemplated by *Monell* and its progeny.

To the extent Mr. Cheairs relies on Mayor Durkan's statement just prior to the events of June 7-8, she cannot be said to have ratified actions that had not yet occurred. Further, Mayor Durkan called for SPD to have a more measured response to protests, rather than ratifying its actions. Last, there is no basis to infer ratification from deleted text messages. The City produced text messages in this litigation, Mr. Cheairs did not depose Mayor Durkan or Chief Best, and he did not offer any text messages as evidence to support his claim. No law supports Mr. Cheairs' argument he is entitled to a *legal conclusion* that a chief policymaker knowingly ratified conduct in a deleted message. This Court should affirm the dismissal of Mr. Cheairs' claims.

## VIII. CONCLUSION

Mr. Cheairs' constitutional rights were not violated. He was not seized in violation of the Fourth Amendment, because he was not targeted by Officer Anderson (or anyone else) and his

freedom of movement was not arrested. Officer Anderson's deployment of the blast ball in response to the violent assaults from the crowd was reasonable and, therefore, not excessive force. Mr. Cheairs' First Amendment rights were not violated, because Officer Anderson did not target him and there is no evidence of retaliatory animus. Because there was no constitutional violation, Mr. Cheairs' *Monell* claim also fails. On top of that, there is no evidence of any policy, practice, or custom sufficient to establish municipal liability, nor that satisfies any of the other avenues for municipal liability. The District Court properly dismissed Mr. Cheairs' claims, and this Court should affirm that ruling.

DATED this 25th day of September, 2024.

KEATING, BUCKLIN &
McCORMACK, INC., P.S.


By: */s/ Thomas P. Miller*
Thomas P. Miller, WSBA #34473
Stuart A. Cassel, WSBA #49808
*Attorneys for Appellees*

801 Second Avenue, Suite 1210
Seattle, WA 98104
Phone: (206) 623-8861
Fax:     (206) 223-9423
Email:  tmiller@kbmlawyers.com
          scassel@kbmlawyers.com

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

### 9th Cir. Case Number(s) No. 24-3163

The undersigned attorney or self-represented party states the following:

[X ]    I am unaware of any related cases currently pending in this court.

[  ]  I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[  ]  I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**DATED** this 25th day of September, 2024.

KEATING, BUCKLIN &
McCORMACK, INC., P.S.


By: */s/ Thomas P. Miller*
Thomas P. Miller, WSBA #34473
*Attorney for Appellees*

801 Second Avenue, Suite 1210
Seattle, WA  98104
Phone:  (206) 623-8861
Fax:     (206) 223-9423
Email:  tmiller@kbmlawyers.com

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs
## 9th Cir. Case Number(s) No. 24-3163

I am the attorney representing Appellees.

This brief contains 12,165 words, including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

**[X] complies with the word limit of Cir. R. 32-1.**

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[  ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [  ] it is a joint brief submitted by separately represented parties;
    [  ] a party or parties are filing a single brief in response to multiple briefs; or
    [  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated
  _____

[  ] is accompanied by a motion to file a longer brief pursuant to
  Cir. R. 32-2(a).

DATED: September 25, 2024

*/s/ Thomas P. Miller__*
Thomas P. Miller, WSBA #34473
*Attorney for Appellees*
801 Second Avenue, Suite 1210
Seattle, WA  98104
Phone: (206) 623-8861
Fax:   (206) 223-9423
Email: tmiller@kbmlawyers.com

64

## CERTIFICATE OF SERVICE

I hereby certify that on September 25, 2024, I electronically filed the foregoing with the 9th Circuit Court of Appeals using the electronic upload system which will send notification of such filing to the following:

### Attorneys for Appellant

Jason Moore, WSBA #41324
PARADIGM LAW
600 First Avenue, Suite LL06
Seattle, WA. 98104
Phone:  425-999-7562
Email:  Jason@paradigmlawseattle.com

### Attorney for Appellant

Jay S. Carlson, WSBA #30411
CARLSON LEGAL
600 First Avenue, Suite LL06
Seattle, WA  98104
Email:  jay@carlsonlegal.com

DATED:  September 25, 2024


<u>/s/ Thomas P. Miller</u>
Thomas P. Miller, WSBA #34473
*Attorney for Appellees*
801 Second Avenue, Suite 1210
Seattle, WA  98104
Phone: (206) 623-8861
Fax:    (206) 223-9423
Email: tmiller@kbmlawyers.com